UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| LEAD GHR ENTERPRISES, INC., formerly d/b/a GOLDEN HILLS RESORT, now d/b/a DAYS INN LEAD, SOUTH DAKOTA | ) ) ) ) ) | CIV. 12-5056-JLV |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** [Docket Nos. 44, 53] |
| vs. | ) ) | |
| AMERICAN STATES INSURANCE CO., | ) ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff Lead GHR Enterprises, Inc. (hereinafter "Lead GHR") brings this diversity action alleging causes of action for breach of contract and bad faith and seeking punitive damages against American States Insurance Company (hereinafter "American States"). Docket No. 1-1. Lead GHR alleges that American States was obligated to indemnify it, pursuant to an enforceable insurance contract, for losses suffered due to an August 3, 2010 hail storm. Id. American States denies any such obligation. See Docket No. 45. Lead GHR has filed a partial motion for summary judgment with respect to its breach of contract claim. Docket No. 53. American States has filed a motion for summary judgment with respect to all of Lead GHR's claims. Docket No. 44. The district court, the Honorable Jeffrey L. Viken, Chief Judge, referred the parties' cross-summary judgment motions to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

The parties largely agree upon the basic facts of this case as reflected in the statements of material facts and the source materials submitted by both parties.   Because both parties have filed motions requesting summary judgment, each has supplied its own statement of material facts.   The court relies on these factual findings in addition to source documents filed in this case in reaching its factual determinations.   The parties' disagreements, where applicable, are noted.

The property in issue in this lawsuit involves a Days Inn, formerly doing business as the Golden Hills Resort (hereinafter "the hotel").[1]   Docket No. 52, at ¶ 1.   The hotel is located at 900 Miner's Avenue, Lead, South Dakota, 57754. Docket No. 55, at ¶ 1.   The hotel is six stories tall and has "a large, standing-seam metal roof [with a surface area of] over 25,000 square feet."   Id. More specifically, the hotel's roof "has a combination shed and gable roof covered with painted 24-gauge steel panels."   Docket No. 52, at ¶ 1.   Lead GHR is the owner and operator of the hotel.   Docket No. 1-1, at ¶ 1.

From 2008 through 2011 the hotel suffered a variety of weather-related incidents that have precipitated the instant litigation.   On August 5, 2008, the hotel was involved in a "significant hail event."   Docket No. 52, at ¶ 3.   As a

---

[1] "[T]he Golden Hills Resort, now known as [the] Days Inn . . . [is self-characterized as] a hotel[,] resort and convention facility."   Docket No. 1-1, at ¶ 1.

result of this hail event, Lead GHR "submitted a claim to its property insurer[,] Harleysville Insurance." Id. at ¶ 4.   Harleysville Insurance retained Ron Erion, an independent insurance claim adjuster, who inspected the hotel and found "widespread hail damage to the metal roof, windows, screens, efis/stucco material on the building, metal trim, and exhaust vent covers." Docket No. 47-7, at 2.[2]   Mr. Erion recommended that J. Scull Construction's bid be accepted because it "was the lowest by a significant amount." Id. at 3.   J. Scull Construction's bid included provisions for "the general conditions, metal roof replacement, gutters and downspouts, windows and stucco repairs" at a base bid of $786,358.00, and an additional $84,067.00 for "PVC Roof above [the] Convention Center." Docket No. 47-9, at 3.   Harleysville Insurance eventually paid Lead GHR approximately $700,000 for damages sustained to the hotel as a result of the August 5, 2008 hail event. See Docket Nos. 52, at ¶ 6; 62, at ¶ 6.

On April 29, 2009, Lead GHR contracted with David Winter of Winter Construction "for the replacement of 26,000 sq. ft. of steel roofing[,] [r]eplacement of gutters and downspouts, heat tape as currently installed, up to 56 window sills as needed, and 6 windows." Docket No. 47-10, at 2.   Winter Construction bid to perform the roof work for $470,000. Id.; see also Docket No. 52, at ¶ 7.   Lead GHR accepted this offer, and Winter Construction commenced construction in 2009. See Docket No. 52, at ¶ 8.

---

[2] The page numbers cited by the court refer to their pagination as assigned under the court's online docketing system.

On August 8, 2009, while Winter Construction was working at the hotel, a rainstorm hit Lead, South Dakota, which "caus[ed] [a] substantial water intrusion at the hotel." Id. at ¶ 9.   Subsequently, on September 8, 2009, Mr. Winter filed a claim against his own liability insurance carrier, Auto-Owners Insurance, for "water damage to rooms in hotel." Docket No. 48-5, at 2. Auto-Owner's Insurance expressly stated that Mr. Winter's insurance policy only "covers the resulting water damage." Docket No. 48-6, at 2.   "[Mr. Winter's] policy does not cover our insured's work that was done on your roof, as we do not guarantee our insured's work or product." Id.

Shortly thereafter, Lead GHR contracted with Daniel Blecha of Hayman & Associates "to review [Winter Construction's] workmanship on the installation of the metal roof covering." Docket No. 48-8, at 2; see also Docket No. 52, at ¶ 12. On October 7, 2009, Mr. Blecha noted several aspects of the roof which could cause "potential moisture entry," including the roof's flashing, flex, joints, and sealant.   Docket No. 48-8, at 2–3.   Additionally, Mr. Blecha noted "several scratches on the surface of the material which have penetrated to bare metal," which could cause the roof to age prematurely.   Id. at 3.   Ultimately, Mr. Blecha opined that "there are several issues that need address[ing] to help insure that there [is not] premature leaking." Id. at 4.   The court is aware that Mr. Winter characterizes the hotel's roof and, by extension, his installation of the same as

"99.9 percent . . . in excellent shape."[3]   Docket No. 56-8, at 26.   However, it was Lead GHR who hired Hayman & Associates for an independent evaluation of Mr. Winter's work.   See Docket No. 48-8, at 2.   As such, Mr. Blecha's findings are taken at face value.

On November 17, 2009, Mr. Blecha  inspected the upper section of the hotel's roof and found that the "bends in the material that have caused a split in the metal roof covering and surface scratches."   Docket No. 48-9, at 2. However, Mr. Blecha ultimately opined that "the upper section of roof is adequate, though there will be upkeep needed to ensure no potential water entry."   Id. at 3.   Subsequently, Rory Maynard, the General Manager and President of Lead GHR, met with Mr. Winter to discuss the issues raised in Mr. Blecha's reports.   Docket Nos. 52 at ¶ 14; 56-8 at 29, 33.   Following this meeting, Mr. Winter carried out some of Mr. Blecha's recommendations, including adding more screws and sealant to fix the expandable foam and painting over the scratches on the roof's surface.   See Docket No. 56-8, at 33–36 With respect to other of Mr. Blecha's recommendations, Mr. Maynard accepted Mr. Winter's explanation that no further action was needed, and none was taken.

---

[3] Despite Mr. Winter's self-serving assessment of his own work on the hotel's roof, the court notes the inherent difficulty in accurately assessing one's own work.   For example, in that same deposition answer, Mr. Winter testified to the excellent condition and lack of leakage in the hotel's "50,000 square foot roof." Docket No. 56-8 at 26.   In fact, Mr. Winter's estimate of the size of the roof and, by extension, the amount of work he completed, was almost double the actual size of the hotel's roof.   See Docket Nos. 47-10 (Mr. Winter contracted to replace only "26,000 sq. ft. of steel roofing."), 55, at ¶ 1.

See Docket No. 48-2, at 10–13 (accepting Mr. Winter's explanation that double layer of flashing was acceptable; accepting Mr. Winter's explanation that the flex may have pre-dated the roof he installed, so he was under no obligation to address the issue[4]; and accepting   Mr. Winter's explanation as to the adequacy of the flex of the joints of the roof).

On December 31, 2009, Auto-Owners Insurance sent Lead GHR a settlement offer of $653,353.36 in exchange for a "full settlement of all claims resulting from [the water damage occurring during the midst of the Winter construction]."   Docket No. 49-1, at 3.   Additionally, Lead GHR agreed that the "settlement [was] made in compromise to terminate further controversy respecting all claims for damages that the undersigned have previously asserted or that the undersigned or his/their personal representatives might hereafter assert because of [the] accident."   Id.   Lead GHR accepted this settlement offer on January 6, 2010.   On February 12, 2010, Lead GHR and David Winter, on behalf of Winter Construction, agreed to "a five-year warranty on any roof issues that are directly a result of the new roof installation that was completed by October 1, 2009."   Docket No. 63-4, at 2.

On April 14, 2010, Lead GHR entered into a twelve month "Commercial Property Coverage," "Commercial General Liability Coverage," and "Commercial

---

[4] Mr. Maynard and Mr. Winter's recollections of their discussion of the problem of flex are at odds.   Mr. Maynard testified that Mr. Winter felt that he did not have to address the flex issue, and Mr. Winter testified that, after talking with Mr. Maynard, he rectified the flex issue by "reinforc[ing] the seam with a bracket underneath . . . to meet the specs of the roof."   Docket No. 56-8, at 32.

Crime Coverage" insurance contract with American States.   <u>See</u> Docket No.

56-1, at 10.   In the section of entitled "Safeco BOP Access: Building and

Personal Property Coverage" the policy states:

**A. Coverage**
> We [American States] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

> **1. Covered Property**
> > a. Building, meaning the building or structure described in the Declarations . . . .[5]

> > ********************

> **4. Loss Payment**
> > a. In the event of loss or damage covered by this Coverage Form, at our option we [American States] will either:

> > > (1) Pay the value of the lost or damaged property;

> > > (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

> > > (3) Take all or any part of the property at an agreed or appraised value; or

> > > (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

> > We [American States] will determine the value of lost or damaged property, or the cost of its repair or

---

[5] <u>See</u> Docket No. 56-1, at 12 (describing Lead GHR's Declarations with respect to its Commercial Property Coverage policy).

replacement, in accordance with the applicable terms of the Valuation Condition of this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**********************

**7. Valuation**

a. We [American States] will determine the value of Covered Property in the event of loss or damage at replacement cost (without deduction for depreciation) of the time of loss or damage, except as provided . . . below.

b. We [American States] will not pay more for loss or damage on a replacement cost basis than *the least of* (1), (2), or (3), subject to c. below.

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property. . . .

c. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

Docket No. 56-1, at 27, 52–53 (emphasis added).

Next, in the section entitled "Safeco BOP Access Causes of Loss—Special Form" the policy states:

8

**A. Covered Causes of Loss**

Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations; that follow

***************

**B. Exclusions**

****************

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

*********

c. **Negligent Work**: Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling or

(4) Maintenance;

of part or all of any property on or off the described premises.

Id. at 58, 61.

Finally, in the section entitled "Commercial Property Conditions" the policy states:

9

### G. Other Insurance

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> 2.  If there is other insurance covering the same loss or damage, other than that described . . . above, we [American States] will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we [American States] will not pay more than the applicable Limit of Insurance.

Id. at 21.

The hotel building, which included the roof, was insured by American States for up to $10,200,000.   Id. at 12.   Additionally, American States asserts, and Lead GHR does not controvert, that the insurance policy "is silent with respect to any definition of [the word] 'damage.' "   Docket No. 45, at 16.   In that same vein, Lead GHR asserts, and American States does not deny, that neither the term "functional damage" nor "insurable damage" appear in the insurance policy.   Docket No. 61, at 3–4.

On April 24, 2010, following a rainstorm, the hotel suffered another water intrusion event after which Lead GHR filed a claim against its insurance policy with American States.   See Docket No. 49-2, at 2.   Lead GHR claimed that it suffered interior water damage to "10 rooms and a public area [an atrium]" due to "water coming from the roof."   Id.; see also Docket No. 49-3.   On August 16, 2010, American States denied coverage as to damages suffered by the hotel as a result of the April 24 water intrusion event, citing the insurance policy's inadequate/faulty workmanship exclusion as the basis for denying coverage.

10

See Docket No. 49-6, at 4–5.   American States concluded that there was no
covered loss because the damage caused by the water intrusion event was due to
Mr. Winter's negligent work installing the hotel's roof.   Lead GHR did not
challenge this assertion.

On August 3, 2010, a "severe thunderstorm with hail came through the
[Lead, South Dakota] area."   Docket No. 50-1, at 2.   The hotel, including its
roof, was struck by hail during this storm.   See Docket Nos. 56-5, at 6; 50-5,
at 3.   Lead GHR filed a "Loss Notice Report" for property damage suffered as a
result of the hailstorm on August 3, 2010.   Docket No. 50-1, at 2–3.   American
States contracted with insurance adjuster, Chris Shopshear, of Eagle Adjusting
Services, Inc., to determine the extent, if any, of the damage to the hotel as a
result of the hailstorm.   Docket No. 50-2, at 2.

After inspecting the lower elevations of the roof, Mr. Shopshear found:
"no damage to any of the siding finish or to the downspouts"; no damage to "the
front gable and lower level roof on the left elevations"; "no damage to the right
slope of the upper level roof"; and "some hail indentations to the gable trim and to
some of the panels on the left upper level roof."   Docket No. 50-5, at 3; see also
Docket No. 51-13 (Mr. Shopshear's inspection report following his October 5,
2010 examination of the hotel's upper roof and sign).   Mr. Shopshear then
stated that "[p]er Janell Anderson [an American States claims specialist] I wrote
to replace the gable trim on the building and I replaced 25% of the left upper

11

slope of the roof."[6]   Id. at 3.   As such, Mr. Shopshear "recommended payment . . . less any applicable deductible."   Id. at 4.

However, during his deposition, Mr. Shopshear stated that he was of the opinion that "there was not enough hail damage to justify . . . any replacement of the roof panels."   Docket No. 56-10, at 79–80; see also id. at 51, 59. Nonetheless, as noted above, Mr. Shopshear prepared an estimate replacing approximately twenty-five percent of the hotel's left upper slope because he was instructed to do so by Janell Anderson.   See Docket Nos. 50-5, at 3; 56-10, at 59.   Mr. Shopshear used the program "Xactimate" to estimate that the actual cash value of repairing and replacing 25% of the hotel's roof, the gable trim, and the air conditioner condenser unit fins to amount to $13,942.60 less the $1,000 deductible with a final net claim amount (not including recoverable depreciation) of $12,942.60.   Docket Nos. 50-5, at 7–8; 56-10, at 54.   Mr. Shopshear prepared this repair estimate despite his knowledge that the total for the work he quoted in his Xactimate estimate was approximately $1,000 to $2,000 lower than the amount it would actually cost to make the repairs.   See Docket No. 56-10, at 65.   Furthermore, Mr. Shopshear testified that in his opinion a contractor is not likely to perform the repairs he recommended "[b]ecause of all the other damage involved with [the hotel's roof]"[7]   See id. at 51–52.

---

[6] Janelle Anderson sent an email to Mr. Shopshear telling him to "[t]ake a good look at this one" prior to his inspection of the hotel following the August 3, 2010 hailstorm.   Docket No. 63-3, at 2.

[7] Mr. Shopshear cited holes in the hotel's roof as a reason why he was doubtful

American States sent Lead GHR a copy of Mr. Shopshear's $13,942.60 repair estimate on November 2, 2010.   Docket 50-6, at 2.   Mr. Maynard, on behalf of Lead GHR, responded that "14K isn't going to put a dent into what it will take to fix [the roof]."   Id.; see also Docket No. 48-2, at 17 (noting that Mr. Maynard, Lead GHR's president, stated that he turned down American States' repair offer of $13,942.60).

As a result of Lead GHR's position regarding American States' estimated cost to repair the hotel's roof, American States contracted with Timothy D. Strasser, an engineer with Haag Engineering, to inspect the hotel's roof.   Docket No. 52, at ¶ 35.   On December 22, 2010, Mr. Strasser outlined five conclusions as a result of his inspection of the hotel's roof:

1. The Golden Hills Resort roof was struck by hail.

2. Hail did not tear metal roofing panels, open lap seams, unseat fasteners, or compromise protective coatings.

3. Hail dented the metal roofing panels on north- and east-facing sections. Hail-caused dents have not altered the performance of the metal roofing panels and the panels could be left as they are.

4. Hail had dented fascia/trim around the roof perimeter with the exception of the heavier gage metal at the north and south ends of the six-story roof. While dented, those items will continue to function normally. Gutters and downspouts lacked discernible dents from hail.

5. Impacting hailstones deformed louvers on multiple mechanical units of guest rooms. Deformations were sparsely concentrated and will not alter the performance of the air conditioners.

---

that a contractor would risk his or her warranty and repair the hotel's roof.   See Docket No. 56-10, at 17–18, 53.

Docket No. 56-5, at 6–7.

On January 10, 2011, American States denied coverage for any damage sustained by the hotel due to the August 3, 2010 hail storm.   Docket No. 56-6. American States, referencing its negligent work exclusion, cited "multiple issues with the installation of the new roof from the prior hail claim," and that it is "unable to provide coverage for the negligent work product of that contractor." Id. at 4.   American States further posited that the hotel "did not sustain any damage due to hail that would require replacement or repair of [the] roof."   Id. at 3; see also id. ("Per the findings of Haag Engineering, the roof of the insured building did [not] sustain any hail damage that requires repairs or replacement of the roofing system.").   In the course of the instant litigation, American States has asserted that it denied coverage for Lead GHR's claim both on the basis of its negligent work exclusion and because the hotel did not suffer an "insurable" or "functional" damage as a result of the August 3, 2010 hail storm.   See Docket No. 65, at 6–8.

Lead GHR did not retain any consultants to dispute the conclusions reached by either Mr. Shopshear or Mr. Strasser.   Docket No. 52, at ¶ 40. Additionally, Lead GHR did not retain any consultants to determine if and to what extent the hotel's value was diminished as a result of the hail storm, or the amount required to repair the roof to its pre-August 3, 2010 condition.   See id. at ¶ 41.   Lead GHR asserts that it is entitled to the full replacement cost of the

14

roof because full replacement value is "the only remaining option for payment under the [insurance] [p]olicy."   Docket No. 62, at 54.   Lead GHR also asserts that "diminished value" is not an appropriate measure of damages under the American States' insurance policy.   Id. at ¶ 41.

On June 24, 2011, another hail storm hit the hotel.   See Docket No. 50-9, at 2.   Subsequently, on June 30, 2011, Lead GHR filed a "Property Loss Notice." Id.   At this point in time, Seneca Insurance Company (hereinafter "Seneca") insured Lead GHR, not American States.   See Docket Nos. 52, at ¶ 44; 62, at ¶ 44; 50-9, at 2.   Seneca contracted with Ron Erion[8] an appraiser with Dakota Claims Service, to inspect the hotel for any possible loss stemming from the hail storm.   Docket No. 50-10, at 2.   Mr. Erion opined that "[s]ome of the damage [to the hotel's roof] is old damage from [a] previous claim and/or construction damage."   Docket No. 51-1, at 2.   Ultimately, Mr. Erion concluded that the hotel's roof has "sustained minor hail damage through all metal roofing slopes. . . . [T]he entire roofing surface should be replaced."   Docket No. 51-3, at 2.

In reaching this conclusion, Mr. Erion relied on the 2009 report (described above) and a 2011 report, documenting the condition of the hotel's roof, both of which were authored by Daniel Blecha of Hayman & Associates.   See Docket No. 52, at ¶ 48.   Mr. Blecha's 2011 report found "several dents in the [roof] material that are noticeable upon inspection. Some areas are cosmetic and will effect [sic]

---

[8] This is the same Ron Erion who inspected the hotel following the 2008 hail storm and the 2009 rain storm for Harleysville Insurance and Auto-Owners Insurance, respectively.   Docket No 52, at ¶ 45.

the value of the property not the functionality of the roof covering."   Docket No. 51-4, at 2.   With respect to the joints and seams, Blecha's most pressing area of concern, he noted "[s]everal dents in the seams . . . throughout the observed portions of the roof," but he stated that "[t]he bends in the seams do not appear[] to have [been] caused by the hail due to the force needed to bend the seams."   Id.

Seneca later made payment to Lead GHR for the full replacement of the hotel's roof and disposal of the old roof.   See Docket No. 62, at ¶ 50; see also Docket No. 51-14, at 2.   Lead GHR appears to have received approximately $369,201.75 (net) from Seneca in settlement of its loss claim as a result of the June 24, 2011 hail storm.[9]   See Docket No. 51-5, at 2.   To date, Lead GHR has "not replaced or substantially repaired its roof."   Docket Nos. 52, at ¶ 51; 62, at ¶ 51.   Lead GHR has used the proceeds of the Seneca settlement to make "capital investment[s]" in the hotel, including "new carpet in the convention center, granite countertops, [and general] upgrade[s] [to the] hotel."   Docket No. 60-1, at 5 (Lead GHR has also saved a portion of its Seneca settlement.).   From approximately 2006 through 2010, Lead GHR has failed to earn a profit and has lost over $1,500,000.   See Docket Nos. 48-2, at 22–24; 48-3, at 2.

---

[9] Lead GHR received $485,775.00--the full cost of repair or replacement less $14,573.25 for depreciation and less $102,000 for deductibles.   Docket No. 51-5, at 2.

# DISCUSSION

The court now considers American States' motion for summary judgment with regard to all of Lead GHR's claims as well as Lead GHR's motion for partial summary judgment with respect to its breach of contract claim. For purposes of judicial economy, the court's analysis of American States' and Lead GHR's cross-motions for summary judgment on the breach of contract claim is combined.

## A.    Standard Applicable to Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).    The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.   See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).    Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a).    Once the movant has met

17

its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.   See Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.   Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted."   Id.   (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

18

## B.    Breach of Contract Claim

Both parties agree that South Dakota law applies in this case.   See

Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012) (citing

Langley v. Allstate Ins. Co., 995 F.2d 841, 844 (8th Cir. 1993)) ("State law

governs the interpretation of insurance policies when federal jurisdiction is

based on diversity of citizenship.").   Under South Dakota law, "'insurance

contract interpretation is a question of law.'"   Cornelius v. Nat'l Cas. Co., 2012

SD 29, ¶ 6, 813 N.W.2d 167, 169 (quoting Batiz v. Fire Ins. Exch., 2011 S.D. 35,

¶ 10, 800 N.W.2d 726, 728–29) (further citations omitted).

To prevail on its breach of contract claim, Lead GHR must show (1) an

enforceable promise; (2) that the defendant breached that promise; and (3) that it

suffered damages as a result of defendant's breach.   See Bowes Constr., Inc. v.

S.D. Dep't of Transp., 2010 S.D. 99, ¶ 21, 793 N.W.2d 36, 43 (citing Guthmiller

v. Deloitte & Touche, L.L.P., 2005 S.D. 77, ¶ 14, 699 N.W. 493, 498).   "If

undisputed facts fail to establish each required element in a cause of action,

summary judgment is proper."   McKie v. Huntley, 2000 S.D. 160, ¶ 17, 620

N.W.2d 599, 603 (citing Groseth Int'l, Inc. v. Tenneco Inc., 410 N.W.2d 159, 169

(S.D. 1987)).   Here, neither American States nor Lead GHR dispute that the

insurance policy constitutes an enforceable promise.   Therefore, this court need

only analyze whether American States breached its promise to Lead GHR and

whether Lead GHR suffered damages as a result of that breach.   In this regard,

each party raises numerous arguments for and against the entry of summary

19

judgment on plaintiff's breach of contract claim.   Each is discussed in turn below.

### 1. Breach of Promise

#### a. Lead GHR's Roof Suffered "Damage"

Central to the determination of whether American States breached its promise to indemnify Lead GHR for a covered loss is whether a covered loss actually occurred, or in this case whether the hail indentations in the hotel's roof constituted a "direct physical loss" or "damage."   If the hail indentations do not constitute a direct physical loss or damage, then American States did not breach the insurance contract by denying coverage under the insurance policy. Conversely, if the hail indentations are considered a direct physical loss or damage, then American States breached the insurance policy by denying coverage.

The court's analysis begins with the plain language of the insurance policy between Lead GHR and American States.   See Pauley v. Simonson, 2006 S.D. 73, ¶ 8, 720 N.W.2d 665, 667–68 (Courts look "to the language that the parties used in the contract to determine their intention.").   As quoted above, American States has promised to indemnify Lead GHR, subject to certain exclusions and valuation limitations, for any "direct physical loss of or damage" suffered by the hotel.   However, neither "direct physical loss" nor "damage" is defined in the insurance contract.   See Docket Nos. 56-1; 47-4 (A condensed version of the insurance policy, which contains only the relevant provisions.); 45, at 16.

20

Because the insurance contract does not define "damage," the court applies the term's "plain, ordinary and popular meaning, which the ordinary and average person would understand." Finck v. Northwest School Dist. No. 52-3, 417 N.W.2d 875, 877 (S.D. 1988) (citations omitted); see also Ass Kickin Ranch LLC v. North Star Mut. Ins. Co., 2012 S.D. 73, ¶ 12, 822 N.W.2d 724, 727–28. As such, the court interprets the term "damage" to mean "physical harm caused to something in such a way as to impair its value, usefulness, or normal function," commonly associated as causing "unwelcome and detrimental effects." Docket No. 51-10, at 2 (citing the OXFORD DICTIONARY definition of "damage"). "Damage" is further defined as "to harm or spoil something." CAMBRIDGE DICTIONARIES ONLINE, http://dictionary.cambridge.org/us/dictionary /american-english/damage_1?q=damage (last visited Apr. 29, 2014).

The court, interpreting "damage" according to its plain and ordinary meaning, finds that the hotel's roof was damaged as a result of the August 3, 2010 hail storm. Although American States has introduced evidence indicating that the functionality of the hotel's roof was not impaired as a result of the hail indentations, see Docket Nos. 47-1; 50-5, the roof was nonetheless impaired as a result of the hail. Neither party disputes that the hotel's roof was struck and dented by hail stones. See Docket Nos. 61, at 8; 47-1, at 4–6. And these hailstones generally ranged in size from .75 of an inch to 1.25 inches in diameter, with the largest reported hail stone found in Lead measuring 1.75 inches in diameter. See Docket No. 47-1, at 4–6. Moreover, American States' own expert

readily identified a number of different hail indentations and splatter marks throughout the hotel's roof and on its appurtenances.   Indeed, Mr. Strasser, in the Haag Report, noted that "[h]ail dented the metal roofing panels on the north-and east-facing roof sections," "[h]ail had dented [the] fascia/trim around the roof perimeter with the exception of the . . . the north and south gable ends," and "[i]mpacting hailstones deformed louvers on multiple mechanical units of guest rooms." Id. at 6–7.   Furthermore, the photographs attached to the Haag Report provide documentation of the hail indentations and splatter marks.   Id. at 11–47.

The plain and ordinary meaning of the term "damage" encompasses not only impairment to functionality but also impairment to usefulness and value, as well as "to harm or spoil" something.   The observations and pictures provided by Mr. Strasser in the Haag Report demonstrate that Lead GHR's covered property has been damaged.   Even if Mr. Strasser is correct that the hotel's roof continues to function properly, it is clear that the condition of hotel's roof, air conditioning condenser unit fins, fascia/trim, and louvers have been harmed, or at least partially spoiled, as a result of the August 3 hail storm and, consequently, their value reduced from their pre-storm condition.

It seems axiomatic that a dented roof is worth incrementally less than an undented roof.   See, e.g., Docket No. 51-9, at 3 (Daniel Blecha testified that "[a] damaged roof does affect the value of a property, any property, residential, commercial.").   Not only has the aesthetic value of the roof been reduced, but so

too has the hotel's potential resale value.[10]   To hold otherwise would require the court to ignore common sense.   Moreover, the court is incredulous that American States would have ordered Mr. Shopshear to prepare a repair estimate for twenty-five percent of the left upper slope of the roof, the gable and trim, and the air conditioning condenser unit fins if it in fact believed that no damage had occurred.   See Docket No. 50-5, at 7.   American States has not presented evidence to the court indicating that the condition of the roof was so bad prior to the hail storm that it could not be further damaged as a result of the hail storm. Furthermore, Mr. Maynard testified that any inadequacies stemming from Mr. Winter's 2009 installation of the hotel's roof had been sufficiently remedied prior to the August 3, 2010 hail storm.   See Docket No. 48-2, at 9–15.

American States' reliance on Mohr v. Am. Auto Ins. Co. is misplaced.   See Mohr v. Am. Auto Ins. Co., No. 01-C-3229, 2004 WL 533475, at *14 (N.D. Ill. Mar. 5, 2004).   In Mohr, the plaintiff brought suit seeking the full replacement cost for the roof of his home which had been damaged by a hail storm.   Id. at 2. The roof was very unique in that it was a thatch-style roof composed of cedar shingles, which in many cases had to be steam-bent prior to placement on the roof, and installation of these shingles required a great amount of expertise.   Id. at 1.

---

[10]  The Days Inn in Lead has a roof with a distinct copper hue with a large bank of windows designed to reflect the same color.   Accordingly, denting to its roof and auxiliary structures not only reduces the hotel's existing aesthetic value, but also diminishes its ongoing aesthetic value by prematurely aging and potentially discoloring the roof.

The question before the court in Mohr was not whether the roof sustained damage as a result of the hail storm—"it unquestionably had sustained damage"—but whether American Auto Insurance Co. was "obligated . . . to pay $400,000 to replace the roof." Id. at 12.   The Mohr case does not stand for the proposition that hail dents do not constitute *any* degree of damage, only that in that case there was an insufficient reduction in aesthetic value to merit a $400,000 entire roof replacement.   Id. at 15.   Additionally, the reduction in the roof's aesthetic value in Mohr which resulted from only partial repair and replacement would decrease over time because the new shingles would be subjected to "the natural weathering process" and would begin to match the appearance of the existing shingles.   Id. at 13.   Here, the roof is made out of steel, not cedar shingles, so the natural weathering process would only serve to expedite, rather than improve, the reduction in aesthetic value of the dented roof.

Similarly, American States' reliance on Eledge v. Farmers Mut. Home Ins. Co., is also misplaced.   Eledge v. Farmers Mut. Home Ins. Co., 571 N.W.2d 105 (Neb. Ct. App. 1997).   In Eledge, the dispute was centered on whether the roof sustained sufficient damage such that "the only workmanlike way to repair the hail damage would be to replace the entire roof," not whether the roof had been damaged by the hail—it had.   Id. at 112.   Thus, although the Nebraska Court of Appeals held that there was insufficient damage to the roof to warrant a full

roof replacement, implicit in this decision is that the hail nonetheless damaged the roof to some degree.   Id.

Finally, the court is not persuaded by the learned treatise discussing the instances when replacement is warranted following either functional or cosmetic damage.   See Docket No. 66 (Shaun E. Gessler & Stephen E. Petty, Hail Damage and General Hail-Strike Damage Assessment Methodology, in FORENSIC ENGINEERING: DAMAGE ASSESSMENTS FOR RESIDENTIAL AND COMMERCIAL STRUCTURES (Stephen E. Petty ed., 2013)).   The provided excerpt only identifies instances where there is likely sufficient damage to merit a replacement of the covered property.   See Docket No. 66, at 41–42.   The treatise does not address what constitutes damage as a threshold matter or even instances where covered property is cosmetically damaged and only a "repair" is required.   See id. Presumably, such instances are not uncommon as American States has included a provision in the Loss Payment section of its policy limiting its coverage in certain circumstances to "the cost of repairing or replacing the lost or damaged property."   Docket No. 47-4, at 8 (emphasis added).   The treatise, like Mohr and Eledge, begins its examination of "damage" at the point of determining whether there is sufficient damage to merit a replacement of the covered property.   This is inapposite at this stage where the inquiry is limited to whether the roof was in fact damaged by the hail storm.   Accordingly, the court finds that Lead GHR's hotel and roof suffered damage as a result of the August 3, 2010 hail storm.

**b. American States' Settlement Offer Did Not Cure Its Breach**

American States' estimate and settlement offer was insufficient to indemnify Lead GHR for the damages sustained by its hotel as a result of the hail storm.   On November 2, 2010, Janell Anderson emailed Rory Maynard with a settlement offer of $13,942.60, less the policy's $1,000 deductible, for a net payment of $12,942.60 to Lead GHR for the repair its roof.   Docket No. 50-6, at 2.   Mr. Maynard considered this a settlement offer and rejected it.   Docket No. 66-2, at 4.   The settlement offer matched the repair estimate generated by Chris Shopshear.   See Docket No. 50-5, at 8.   To be sure, Mr. Shopshear opined that the hotel had sustained no damage.   Docket No. 56-10, at 59.   However, on instruction from Janell Anderson, he prepared an estimate replacing the hotel's gable trim, twenty-five percent of the roof's left upper slope, and the air conditioning condenser unit fins.   Docket Nos. 56-10, at 41; 50-5, at 7.

Mr. Shopshear's estimate, by his own admission, was inaccurate and insufficient to cover the cost of his proposed repairs.   See Docket No. 56-10, at 63–65, 67.   For example, Mr. Shopshear quoted a $17 additional charge for the removal and replacement of a high roof (roofs of two stories or greater) despite having knowledge that such an amount was an insufficient sum to pay for such work.   Id. at 63–64.   Mr. Shopshear further estimated an equipment operator cost of $40 per hour, despite the fact that it cost him $69.50 per hour for an operator when he inspected the roof only two to three weeks earlier.   See Docket Nos. 56-4, at 5; 56-10, at 69–70 (Although Mr. Shopshear testified that the

26

equipment operator cost him $79, the actual price appears to be $69.50.); 50-5, at 2.   In light of Mr. Shopshear's testimony regarding the inaccuracy and insufficiency of his estimate, the court notes that Mr. Strasser, in the Haag Report, also found damage on sections of the roof's east-facing slope, which may not have been included in Mr. Shopshear's estimate.   Compare Docket Nos. 56-10, at 41–42; 56-4, at 39 (Mr. Shopshear's Final Report), with Docket No. 56-5, at 6 (The Haag Report) (noting that Mr. Shopshear's repair estimate as to the hotel's roof was limited to twenty-five percent of the roof's left (apparently south[11]) upper slope.).   Mr. Shopshear opined that it would cost approximately $1,000 to $2,000 more than his quoted amount to perform his suggested repairs. Id. at 65.

American States' settlement offer was insufficient to cover even the minimal repairs it suggested.   And, when viewing the evidence in the light most favorably to Lead GHR, a genuine dispute of material fact exists as to whether the estimate prepared by Mr. Shopshear fully encompasses the entirety of the damage suffered by the hotel and its roof.   The court finds that the hotel's roof has in fact been damaged as a result of the August 3, 2010 hail storm, and American States' estimate and settlement offer were insufficient to satisfy its

---

[11] The court assumes that Mr. Shopshear's south slope is the same as Mr. Strasser's north slope.   See Docket No. 56-10, at 90–94 (In a follow-up line of questioning at Mr. Shopshear's deposition, counsel for American States clarified that either Mr. Shopshear or Mr. Strasser had mislabeled the orientation of their maps, such that Mr. Shopshear's south was in fact Mr. Strasser's north.   Accordingly, Mr. Shopshear's examination did not omit an entire slope of the hotel's roof as was previously asserted earlier in his deposition.   See id. at 86–89.).

indemnification obligation under the insurance policy.   Therefore, the court finds that American States breached its insurance contract with Lead GHR in denying coverage.

### c.   The Subsequent Seneca Insurance Claim

American States argues that Lead GHR's subsequent insurance settlement with Seneca bars any recovery by Lead GHR under the policy issued by American States.   American States relies upon the "other insurance" provision in the policy it issued to Lead GHR in arguing that recovery is barred. That "other insurance" provision in American States' policy prohibits payment where there is "other insurance covering the same loss or damage."   Docket No. 47-4, at 3.   American States correctly asserts that when an insured has *concurrent* insurance, South Dakota case law and the instant insurance policy operate to prevent the insured from obtaining a double recovery. See id.; Nickerson v. Am. States Ins., 2000 S.D. 121, ¶ 16–18, 616 N.W.2d 468, 472–73; Hart v. State Farm Mut. Auto. Ins. Co., 248 N.W.2d 881, 883–84 (S.D. 1976).

However, this is not the case here.   American States insured Lead GHR's hotel property from April 14, 2010 to April 14, 2011, at 12:01 a.m., see Docket No. 47-4, at 2; and Seneca insured Lead GHR from April 14, 2011 to April 14, 2012.   Docket No. 50-9, at 2.   The property damage which resulted in Lead GHR's settlement with Seneca occurred on June 24, 2011.   Id.   Lead GHR's property damage claim submitted to Seneca represents an independent claim made against its subsequent property insurer after the expiration of American

28

States' insurance policy.   Lead GHR's insurance policies ran consecutively, not concurrently:   immediately after American States' policy expired on April 14, 2011, Seneca's policy began.   Thus American States' insurance policy with Lead GHR had expired prior to the time Lead GHR filed its claim with Seneca.   As a result, Lead GHR never had concurrent insurance "covering the same loss or damage," and the "double recovery" bar is inapplicable.   Lead GHR's subsequent damage to its roof from the June 24, 2011 hail storm and insurance settlement from Seneca is irrelevant and does not alter American States' obligations under its own insurance policy.

Seneca's decision to replace the hotel's entire roof-- notwithstanding information that some of the damage sustained by the hotel's roof was likely caused by more than just the June 24, 2011 hail storm, see Docket No. 51-4, at 2-- was an independent business decision by Seneca and does not relieve American States from its obligations to Lead GHR under the terms of its own contract.   Had Lead GHR brought its June 24, 2011 claim against American States it is clear that American States would have denied coverage for the loss because the event occurred outside the time frame of American States' coverage. Accordingly, American States cannot now assert that Seneca's settlement with Lead GHR on a subsequent property damage claim also satisfies its obligations arising under a prior insurance policy.

29

**2.    Damages Suffered by Lead GHR as a Result of American States'
Breach of Contract**

Lead GHR has suffered damages as a result of American States' refusal to

provide insurance coverage for the hail damage sustained by the hotel during the

August 3, 2010 hail storm.   The damaged portions of the hotel's roof, its

appurtenances, and fascia/trim require repair or replacement.   Under the

valuation section of the insurance policy, Lead GHR is entitled to the lesser of (1)

the policy limit, (2) the cost to replace the damaged property with comparable

material, and (3) "[t]he amount actually spent that is necessary to repair or

replace the lost or damaged property."   Docket No. 47-4, at 9.   Lead GHR is not

making a claim for the policy limits.   Docket No. 61, at 10.   Thus, the parties'

dispute lies in whether Lead GHR is entitled to the full replacement cost of the

roof or whether Lead GHR's recovery is limited to the cost of repairing the roof.

**a.    Full Replacement Value v. Cost of Repair**

A jury should determine the amount of damages that Lead GHR sustained

as a result of the August 3, 2010 hail storm.   Based on the evidence before the

court, the court finds that a genuine issue of material fact exists as to whether a

full roof replacement is required or whether a repair or partial replacement would

restore the hotel's roof to substantially the same condition that it was in

immediately prior to the August 3 hail storm.   Moreover, if the roof is in fact

irreparable, the court finds that a genuine issue of material fact exists as to the

proximate cause of the roof's irreparability.

### i. A Jury Must Determine Whether Lead GHR's Roof Is Irreparably Damaged

The South Dakota Supreme Court has held that "[t]he words 'repair' and 'replace' used in a policy of insurance mean the restoration of the insured property to substantially the same condition in which it was immediately prior to the damage." Cf. Grubbs v. Foremost Ins. Co., 141 N.W.2d 777, 778 (S.D. 1966) (citations omitted) (discussing a "repair or replacement" provision in the context of an automobile insurance policy). Further, the South Dakota Supreme Court held that where insured property can be reasonably repaired the "repair or replacement" provision of an insurance policy will be enforced. Stucker v. Travelers Indem. Co., 84 N.W.2d 566, 569 (S.D. 1957). Insured property need only be replaced when it is damaged beyond repair such that it cannot be restored to its former condition. Id. The insurance company bears the burden of proof to demonstrate that the damaged property could be restored to its former condition by repair or partial replacement. Id. (citations omitted).

Two insurance adjusters, Mr. Erion and Mr. Shopshear, provide conflicting testimony regarding whether the hotel's roof could be repaired or partially replaced or whether it required a full replacement as a result of damage sustained during the August 3, 2010 hail storm. Mr. Erion testified that a damaged metal roof cannot be repaired and must be replaced, see Docket No. 56-11, at 83–85, 91–93, while Mr. Shopshear testified that a damaged metal roof can be restored by a partial replacement of the damaged sections. See Docket No. 56-10, at 53–54, 67–68. With regards to Mr. Erion's testimony, he

31

stated that there are "no repair options that [he is] aware of on hail damage to a metal roof."   Docket No. 56-11, at 91; <u>see also</u> <u>id.</u> at 92 ("[T]here's just no repairability [sic] to a hail dent on a metal roof.").   Mr. Erion testified that the reason a metal roof could not be repaired was because "you have to tear the metal off to get to [the dent] . . . [t]here's no way to get under [the roof] and take the dents out."   <u>Id.</u> (contrasting repairing a dent on a metal roof with the paintless dent repair methods used repairing dents on an automobile). Mr. Erion further testified that "there's nobody to repair hail dents on a metal roof."   <u>Id.</u> at 84.   Finally, Mr. Erion testified that in his opinion "patchwork jobs" are unacceptable.   <u>Id.</u> at 93.

However, Lead GHR's reliance on <u>Higginbotham v. N.H. Indem. Co.</u> in support of Mr. Erion's testimony is misplaced.   <u>Higginbotham v. N.H. Indem. Co.</u>, 498 So.2d 1149 (La. Ct. App. 1986).   In <u>Higginbotham</u>, the plaintiff's roof was damaged in a hail storm, and the defendant insurance company offered only the cost necessary to repair the roof as its settlement offer.   <u>Id.</u> at 1150 (noting the similarities between the valuation provisions in <u>Higginbotham</u> with this case).   The Louisiana Court of Appeals held that although a "spot repair" or partial repair and replacement was possible, because the contractors could not guarantee that the roof would not continue to leak unless it was fully replaced, the insureds were entitled to a full replacement of their roof.   <u>Id.</u> at 1152.

Distinguishing this case from <u>Higginbotham</u> is that American States, through its expert witness, Mr. Strasser, has introduced evidence indicating that

32

the roof will not leak and will continue to function normally despite the hail damage.   See Docket No. 56-5, at 6–7 ("Dents from the hail did not diminish the [roof's] water shedding ability.").   Moreover, the hail damage sustained by the roof was relatively minor, and Mr. Shopshear has testified to the feasibility and adequacy of repairing or partially replacing the damaged sections of the hotel's roof.   See infra.

In contrast to Mr. Erion's testimony, Mr. Shopshear, also an insurance adjustor, testified that only a partial replacement of the damaged sections of the roof is necessary to restore the hotel's metal roof to its pre-August 3, 2010 condition.   Although Mr. Shopshear opined that no contractor would repair the hotel's roof, see Docket No. 56-10, at 52–53, his underlying rationale indicates that a metal roof can nonetheless be restored via a partial replacement of its damaged sections.   Indeed, Mr. Shopshear testified unequivocally that partial roof repairs are in fact performed, id. at 68, and that in his opinion it is perfectly acceptable to perform such repairs.   Id. at 58 (using the term "repair" rather than "replacement").   Mr. Shopshear documented the process by which a partial roof replacement is performed.   See id. at 53, 56–58 (describing how the metal seam is cut open with a special machine, replaced, and then re-seamed).   Mr. Shopshear also identified a local company, Black Hills Roofing, that performs partial roof replacements.   Id. at 53.   Further, although the plaintiff disputes the pricing applied by the industry-wide Xactimate estimating program,

33

Mr. Shopshear testified that the program nonetheless documents the process by which a partial roof replacement can be performed.   See id. at 55–57.

Accordingly, Lead GHR's assertion that Mr. Shopshear's testimony supports its assertion that the hotel's roof is irreparably damaged, and it is, therefore, entitled to a full roof replacement by "default" is misplaced.   As previously described, Mr. Shopshear testified that the damaged section(s) of the hotel's roof could in fact be partially replaced or repaired, but the reason that a contractor would not repair Lead GHR's roof was "[b]ecause of all of the other [non-hail] damage" to the roof—i.e., the substandard installation by Winter Construction.   Docket No. 56-10, at 52.   Mr. Shopshear went on to clarify that, if he were a contractor, he would not repair the roof because he would have difficulty "keep[ing] his warranty because of the shape the roof was in from [Winter Construction]."   Id.

Thus, Mr. Shopshear did not opine that the roof could not be repaired. Rather, he stated that the roof could in fact be repaired, see id. at 53–54, 67–68, but he would not want to make the repairs due to the potential difficulty of standing behind his work on a roof that, in his opinion, suffered from pre-existing installation damage.   See id. at 53, 76–77.   However, despite Mr. Shopshear's testimony in support of partial roof replacements, he admitted that he could name only one instance, a two-story Texas strip mall, where he believes he saw a partial roof replacement, and he could not state with certainty whether this was a full or partial roof replacement.   See id. at 68–69.

34

At this stage of the litigation, the court cannot say whether the hotel's roof, a metal standing-seam roof, is in irreparable condition such that a full replacement of the roof is required.   Although it is not entirely clear whether Mr. Erion includes a partial roof replacement as a type of "repair," which cannot be performed on a metal roof, or why he views "patchwork jobs" as unacceptable, Lead GHR has nevertheless presented sufficient evidence indicating that its roof may in fact be in irreparable condition as a result of the August 3, 2010 hail storm.   Conversely, American States has presented evidence indicating that the damaged sections of the hotel's roof can be partially replaced in such a way that the roof could be restored to substantially the same condition that it was in immediately prior to the August 3 hail storm.   The condition of the hotel's roof, whether it can be repaired or partially replaced or if it must be replaced in its entirety, is a material fact—if not the primary fact—in this litigation. Accordingly, the court concludes that a genuine issue of material fact exists as to whether the hotel's roof can be partially repaired or replaced or whether it must be fully replaced and, therefore, the extent of the damages owed to Lead GHR as a result of the August 3, 2010 hail damage are also in dispute.

### ii. The Proximate Cause of the Roof's Irreparability

Under South Dakota Law, for a "breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused . . . ."   SDCL § 21-2-1 (2014).   Questions of proximate cause are usually questions of fact for the jury

35

to determine.   Cf. Wildeboer v. S.D. Junior Chamber of Commerce, Inc., 1997

S.D. 33, ¶ 10, ¶ 44, 561 N.W.2d 666, 669, 673–74 (Similar to a negligence case,

this case involves a significant amount of conflicting testimony).   In briefing, the

parties have provided conflicting testimony disputing the proximate cause of the

roof's alleged irreparability.

For its part, Lead GHR relies on Mr. Erion's testimony and

Mr. Shopshear's statement that he would not repair or partially replace sections

of the hotel's roof due to warranty concerns for his work.   However, it is clear

that the basis for Mr. Shopshear's opinion is his concern for guaranteeing his

work product, as a business person, in light of the roof's previously-existing

deficiencies following its installation by Winter Construction.   See Docket Nos.

48-8, 48-9.   Without regard to Mr. Erion's testimony, if the court was to view

Mr. Shopshear's testimony as Lead GHR recommends, the proximate cause of

the roof's alleged irreparability, according to Mr. Shopshear, is the deficiencies in

its original installation by Mr. Winter—not the subsequent hail damage.

It is for this reason that Culhane v. W. Nat'l Mut. Ins. Co. is inapposite to

this case.   2005 S.D. 97, 704 N.W.2d 287.   In Culhane, the plaintiff was

involved in a one-vehicle accident, which required repairs totaling almost

$13,000.   Id. at 288.   Additionally, the plaintiff alleged that the vehicle would

sustain a diminution in market value of $8,000 to $10,000 as a result of these

repairs.   Id. at 289.   Western National Mutual Insurance paid the full cost of

the repairs ($13,000) but denied coverage for any post-repair diminution in

value.   Id.   The South Dakota Supreme Court held that where an insurance policy limits an insured's loss recovery to the lesser of the cost of repairs or lost value, the policy limitation will be enforced as written and either—but not both—may be recovered by the insured.   Id. at 291.

In Culhane, as distinguished from this case, the damage sustained by the insured property occurred as part of a covered loss (an automobile accident). Id. at 288–89.   The Court gave no indication that the automobile was damaged or had suffered a loss in value prior to the accident.   Id.   Under these circumstances, the Court held that the plaintiff was entitled to the lesser of the repair or replacement costs, and that the insurance company was not required to pay for the car's lost value in addition to its cost of repair.   See id. at 296, 301. Here, if the roof is in fact irreparable, American States has presented evidence that it is due to contractors' unwillingness to work on an already-damaged roof, and that damage dates back to Winter Construction's original installation, which is not a covered loss under Lead GHR's insurance policy with American States. Thus, the holding in Culhane entitles Lead GHR to the lesser of the cost of repair or replacement, but that holding is otherwise inapplicable to this case.

For its part, American States directs the court to the rationale applied by the Court in All Saints Catholic Church v. United Nat'l Ins. Co.   257 S.W.3d 800, 802–03 (Tex. App. 2008).   In All Saints, a church purchased a commercial insurance policy insuring, among other things, against hail damage.   Id. at 802. However, the church's roof was made with tiles that absorbed excessive

37

moisture, causing them to break, rot, and generally deteriorate.   Id. Subsequently, the church was struck by a hail storm, and the damaged tiles needed to be replaced.   Id.   However, the non-damaged tiles could not sustain the requisite repairs without breaking, so a full roof replacement was required. Id.   The Texas Court of Appeals applying the doctrine of concurrent causation held that the insurance company was liable for only the cost of repairing the damaged tiles.   Id. at 802–04.

In reaching this decision, the Texas Court of Appeals stated that "[u]nder the doctrine of concurrent causation, where covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril."   Id. at 802.   The Texas Court of Appeals further described the doctrine of concurrent causation as "a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove their damage is covered by the policy." Id. (citations omitted).

Here, American States has presented evidence that the reason for the hotel roof's alleged irreparability is the quality of the installation by Winter Construction in 2009.   See Docket Nos. 48-8; 48-9 (documenting Daniel Blecha's findings following his examination of Mr. Winter's work.).   Damage caused by or resulting from Winter Construction's installation of the roof is excluded from coverage under Lead GHR's insurance policy.   Docket No. 47-4, at 11.   Therefore, American States asserts that a contractor's unwillingness to

38

repair minor hail damage due to the roof's prior negligent installation does not bring Mr. Winter's negligent work within coverage limits of Lead GHR's insurance policy.   Thus, American States asserts that the proximate cause of the roof's alleged irreparability remains an excluded loss.

However, in addition to <u>All Saints</u> representing only persuasive authority, Lead GHR has introduced sufficient evidence at this juncture distinguishing this case from <u>All Saints</u>.   In <u>All Saints</u>, the church's roof could not be "spot" repaired because the non-damaged tiles—due to latent defects and wear and tear (non-covered perils)—could not sustain the repairs necessary to restore the roof. <u>All Saints</u>, 257 S.W.3d at 802.   Here, Mr. Erion has provided testimony that the roof's alleged irreparability stems from the fact that it is composed of metal, which cannot be repaired, rather than Mr. Winter's purported negligent installation, a non-covered peril.   Furthermore, unlike the tiles used in <u>All Saints</u>, there is no indication that a defect in the roof's metal caused its irreparability.   <u>Id.</u> at 803.   Mr. Maynard has also provided testimony that the hotel's roof was functioning normally at the time of the hail storm and that any inadequacies of Mr. Winter's original installation had been cured in advance of the August 3, 2010 hail storm.   <u>See</u> Docket No. 48-2, at 9–15.   Therefore, Lead GHR has adduced at least some evidence indicating that a full replacement of the hotel's roof is required due to the roof's metal composition rather than Mr. Winter's 2009 installation.

The parties have provided conflicting evidence regarding the proximate cause of the hotel roof's alleged irreparability.   The issue of proximate causation must be resolved in order to determine the extent of Lead GHR's damage recovery on its breach of contract claim.   Accordingly, if the hotel's roof is in fact irreparable, the court finds that a genuine issue of material fact exists as to the cause of the roof's irreparability, and the issue should be placed before a jury.

### iii.   Lead GHR's Failure to Repair Its Roof Does Not Entitle It to a Full Roof Replacement

Lead GHR asserts that it is entitled, by default, to a full roof replacement because it has not yet *actually* expended any money repairing its roof.   In reaching this conclusion, Lead GHR focuses its analysis again on subparagraph (b)(3) of the valuation section of the insurance policy, which limits the American States' liability to "[t]he amount *actually* spent that is necessary to repair or replace the lost or damaged property."   Docket No. 47-4, at 9 (emphasis added). Lead GHR reasons that the inclusion of the term "actually" creates a condition precedent such that subparagraph (b)(3) is not triggered and is inapplicable until and unless Lead GHR *actually* repairs or replaces its roof.   See Docket No. 61, at 11, 13.   Thus, Lead GHR posits that subparagraph (b)(3) does not limit the indemnification obligation owed by American States, and, therefore, it is entitled to a full roof replacement.   Lead GHR's interpretation of the contract is in error.

An insurance policy must be interpreted to give effect to each provision in the policy, and no single provision should be construed in isolation.   Prokop v. North Star Mut. Ins. Co., 457 N.W.2d 862, 866 (S.D. 1990); see also In re

Dissolution of Midnight Star, 2006 S.D. 98, ¶ 12, 724 N.W.2d 334, 337 (citations omitted) ("Courts must "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation."").   Furthermore, Courts must look "to the language that the parties used in the contract to determine their intention." Pauley v. Simonson, 2006 S.D. 73,   ¶ 8, 720 N.W.2d 665, 667–68.   The Court may not seek out a "strained or unusual meaning for the benefit of the insured." Chord v. Reynolds, 1999 S.D. 1, ¶ 14, 587 N.W.2d 729, 732.   Where the terms of an insurance contract are unambiguous, it, like any other contract, is construed according to the plain and ordinary meaning of its words.   Pete Lien & Sons, Inc. v. First Am. Title Ins. Co., 478 N.W.2d 824, 827 (S.D. 1991).   Therefore, where the language of an insurance contract is clear and unambiguous, "it is the duty of [the] Court to declare and enforce it." Pauley, 2006 S.D. 73, ¶ 8, 720 N.W.2d at 668.

Here, Lead GHR is attempting to broaden its insurance coverage to ensure that it reaches its "full-roof-by-default" interpretation of the valuation provision of its insurance policy.   See Docket No. 47-4, at 9.   Lead GHR's interpretation of the policy would give an insured an entitlement to the full replacement cost of damaged property, bypassing any discussion of repairing the property, so long as the insured does not *actually* spend any money repairing the damaged property. This interpretation is at odds with the valuation and loss payment sections of the insurance policy.

The valuation section limits American States' liability to the "lesser of" the policy limits, replacement costs, or the necessary repairs.   Lead GHR's interpretation would essentially allow the insured to self-select out of the necessary repairs limitation thereby nullifying the third prong of the provision. Such a result is especially likely in light of the fact that it would almost always be in the insured's best interest to receive the full replacement cost of the damaged property, rather than the cost of repair.   Thus, under most circumstances, Lead GHR's asserted interpretation would fail to give effect to the entirety of the valuation section as written.   See Prokop v. North Star Mut. Ins. Co., 457 N.W.2d 862, 866 (S.D. 1990).

Lead GHR's interpretation also fails to give effect to the loss payment section of the insurance policy.   See Docket No. 47-4, at 8.   In the loss payment section, American States is entitled to choose between "pay[ing] the value of lost or damaged property" or "pay[ing] the cost of repairing or replacing the lost or damaged property."   Id. (The applicability of loss payment options three and four was not raised on the facts of this suit, and the court's analysis applies irrespective of their applicability.).   An insured's unfettered ability to self-select out of the necessary-repairs valuation limitation effectively nullifies American States' option to pay the cost of repairs in satisfaction of its loss payment obligation.   Thus, American States would be forced to pay either the value of the damaged property or its full-replacement cost and would lose its option under

42

the policy to pay for only the cost of repairs.   The insurance policy does not contemplate limiting American States' loss payment options in this way.

The court finds that the phrase, "the amount actually spent that is necessary to repair or replace the lost or damaged property" to unambiguously require only a "factual determination of the amount the insured actually must spend to repair the property, and whether such expenditure is necessary under the circumstances."   Seamon v. Acuity, No. A11-429, 2011 WL 6015355, at *4 (Minn. Ct. App. Dec. 5, 2011) (reaching the same conclusion regarding an insurance policy with similar policy language); see also MMI Reality Servs., Inc. v. Westchester Surplus Lines Ins. Co., Civ. No. 07-00466-BMK, 2008 WL 4907905, at *4 (D. Haw. Nov. 17, 2008) (finding that "appraisers can ascertain 'the amount actually spent that is necessary to repair or replace the lost or damaged property' ").

Lead GHR's strained interpretation of an isolated provision of the insurance policy fails to give effect to the entirety of the insurance policy as written.   This court finds that Lead GHR's interpretation of the insurance policy is incorrect as a matter of law, and Lead GHR is not entitled to a full replacement of its roof based on the fact that Lead GHR has not "actually" repaired its roof. See Cornelius v. Nat'l Cas. Co., 2012 SD 29, ¶ 6, 813 N.W.2d 167, 169 (citations omitted) ("[I]nsurance contract interpretation is a question of law.").

### b.    A Factfinder is Required to Determine the Extent of the Damages Suffered by Lead GHR

The court has concluded that Lead GHR's hotel and roof sustained damage

as a result of the August 3, 2010 hail storm, which it has yet to receive

indemnification for.   The court has also found that a genuine dispute of material

fact exists as to the amount of the damages suffered by Lead GHR as a result of

American States' breach of contract.   "Once a plaintiff has established the *fact*

she has been damaged, uncertainty over the *amount* of her damages is not fatal

to recovery."   Weekley v. Prostrollo, 2010 S.D. 13, ¶ 24, 778 N.W.2d 823, 830

(citing Schmidt v. Wildcat Cave, Inc., 261 N.W.2d 114, 118 (S.D. 1977); see also

McKie v. Huntley, 2000 S.D. 160, ¶ 18, 620 N.W.2d 599, 603 (citing SDCL

§ 21-2-1 (2014)) ("To recover damages for breach of contract, the loss must be

clearly ascertainable in both its nature and origin.).   "The rule which precludes

recovery of uncertain and speculative damages applies only where the fact of

damages is uncertain, not where the amount is uncertain."   Weekley, 778

N.W.2d at 830 (quoting Cope v. Vermeer Sales & Serv. of Colo., Inc., 650 P.2d

1307, 1309 (Colo. App. 1982).

Although the precise extent of Lead GHR's hail damage and the

corresponding cost of repair stemming from the August 3, 2010 hail storm is

uncertain, it is clear that Lead GHR has been damaged by American States'

failure to provide adequate insurance coverage to repair or replace the damaged

property.   A genuine issue of material fact exists as to the extent of the damages

suffered by Lead GHR.   A dispute regarding the amount of Lead GHR's damages

should be submitted to the jury.   Therefore, with respect to Lead GHR's breach of contract claim, this court recommends that American States' motion for summary judgment be denied.   With respect to Lead GHR's partial motion for summary judgment, the court recommends that it be granted with regard to American States' liability for the breach of contract claim.   However, with regard to its damage calculation on that breach of contract claim, the court recommends that Lead GHR's partial motion for summary judgment be denied and submitted to a jury for determination.

**C.     First-Party Bad Faith**

The South Dakota Supreme Court first recognized a cause of action for first-party insurance bad faith in Champion v. United States Fid. & Guar. Co., 399 N.W.2d 320 (S.D. 1987).   The South Dakota Supreme Court has reaffirmed its holding in Champion on numerous occasions and in doing so has articulated the following test for first-party bad faith:

> [T]here must be an absence of a reasonable basis for denial of policy benefits [or failure to comply with a duty under the insurance contract] and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial[.] [I]mplicit in that test is . . . that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.

> Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.

Dakota, Minn. & E. R.R. Corp. v. Acuity, 2009 SD 69, ¶ 17, 771 N.W.2d 623, 629 (S.D. 2009) (some alterations in original and some alterations supplied) (quoting Walz v. Fireman's Fund Ins. Co., 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70 (quoting Champion, 399 N.W.2d at 324)) (internal quotation marks omitted); see also Sawyer v. Farm Bureau Mut. Ins. Co., 2000 S.D. 144, ¶ 18, 619 N.W.2d 644, 649.   Bad faith is usually an issue of fact for the jury.   Isaac v. State Farm Mutual Auto. Ins. Co., 522 N.W.2d 752, 758 (S.D. 1994).   The jury should determine whether the insurer acted in bad faith "based on the facts and law available to [the insurer] *at the time it made its decision to deny coverage.*"   Id. (emphasis added).

The South Dakota Supreme Court has extended an insured's bad faith claim "to situations beyond mere denial of policy benefits." Hein v. Acuity, 2007 SD 40, ¶ 13, 731 N.W.2d 231, 236 (S.D. 2007) (citing Julson v. Federated Mut. Ins. Co., 1997 SD 43, ¶ 6, 562 N.W.2d 117, 119).   The Court reasoned that "[f]irst-party bad faith . . . is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured."   Id. at 235 (citing Champion, 399 N.W.2d 320, 324 (S.D. 1987)) (among other cases).   As such, "[b]ad faith conduct may include the failure to conduct a reasonable investigation concerning the claim."   Dakota, Minn. & E. R.R. Corp., 2009 S.D. 69, ¶ 19, 771 N.W.2d at 629 (citing Walz, 1996 S.D. 135, ¶ 8, 556 N.W.2d at 70).   Although a "failure to comply with a duty under the insurance contract" may give rise to a

bad faith claim, the insured must still demonstrate that the "insurance company consciously [engaged] in wrongdoing." Id.   On summary judgment, "[t]he burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." Hahne v. Burr, 2005 S.D. 108, ¶ 6, 705 N.W.2d 867, 870–71.

American States has failed to demonstrate the absence of a genuine issue of material fact with regards to Lead GHR's bad faith claim.   Although it is clear that American States denied coverage for damage stemming from the August 3, 2010 hail storm based in part on the opinions of its two paid consultants, Mr. Shopshear and Mr. Strasser, Lead GHR's bad faith claim lies in how American States characterized and utilized Mr. Strasser's conclusions in reaching its coverage position and the process by which Mr. Shopshear investigated the hail claim.

Mr. Strasser's examination report (the Haag Report), while noting the hail dents from the August 3, 2010 hail storm, repeatedly referenced the lack of functional damage to the hotel's roof and its appurtenances. See Docket No. 47-1.   Mr. Strasser's report makes no reference to any type of damage other than that which would impair the functionality of the roof.   In fact, Mr. Strasser's report appears to indicate that the roof sustained hail damage, but that its ability to function properly was nonetheless unimpaired.   American States then expressly relied on Mr. Strasser's report in reaching its position that the roof did not sustain *any* type of damage.   Docket No. 50-7, at 3–4.   The

47

testimony from American States' chosen representative, John Clone, tells a similar story.   Mr. Clone stated, "[i]f there's no functional damage to the roof, we do not pay for the replacement or repairs to the roof."   Docket No. 56-2, at 30. And, "we're not denying the hail damage because of workmanship. We're denying the hail damage because there's no functional damage."   Id. at 70.

It appears that at the time American States made the decision to deny Lead GHR's hail damage claim it read its policy as requiring that the damage must also impair the roof's functionality in order to require American States to repair or replace the damaged property.   However, American States' insurance policy with Lead GHR does not distinguish between types of damage.   In fact, as American States has noted, "damage" is not defined anywhere in the insurance policy and must be interpreted accordingly to its plain and ordinary meaning, which is broader than strictly functional damages.   See supra Part B.1.a. American States' interpretation of the policy as requiring that the damage sustained by the roof also impair its functionality before repair or replacement will be provided is an interpretation not supported by the terms of the insurance policy.   Accordingly, a reasonable jury could find that American States' denial of coverage based on a purported lack of functional damage to be an unreasonable basis on which to deny coverage under the insurance policy.   Furthermore, American States' representation that Mr. Strasser's report indicated a lack of any damage is unsupported by the contents of his report, and for American States to re-characterize it as such could cause a reasonable jury to find that

48

American States exhibited a reckless disregard for its obligations under the insurance policy.

The circumstances surrounding Mr. Shopshear's examination of the hotel also give rise to concerns for his independence and, by extension, the reasonableness of American States' investigation of Lead GHR's hail claim.   The court is troubled by the influence American States exerted over Mr. Shopshear. Mr. Shopshear readily admits that he does what the client, American States, wants him to do, see id. at 60, and that American States "calls the shots on repairs." Id. at 42.[12]   And, as was illustrated above, Mr. Shopshear prepared an estimate for Lead GHR's roof, despite having first-hand knowledge that the repairs he suggested could not be performed for the price he quoted.[13]   See supra Part B.1.b.

To be sure, Mr. Shopshear initially concluded that there was no damage to the hotel's roof, and American States instructed him to nevertheless write an estimate repairing a small portion of the roof, which at first blush seems to demonstrate American States' beneficence towards Lead GHR.   However, this

---

[12] Ms. Anderson's overture to Mr. Shopshear that he "[t]ake a good look at this one" must also be understood in this context.   Docket No. 63-3, at 2.

[13] Throughout his deposition, Mr. Shopshear stated that he was not at liberty to independently adjust the prices quoted by the Xactimate system.   See, e.g., Docket No. 56-10, at 64, 70.   However, Mr. Erion testified that in his prior dealings with American States he had never been told that he could not independently adjust his price estimates to correct known inaccuracies.   See Docket No. 56-11, at 88.   Furthermore, even if Mr. Shopshear's statement is correct, American States' policy preventing him from correcting prices he knows to be low and inaccurate, impairs his ability to independently determine the amount of the insured's loss, as well as the accuracy of his estimate.

court has already determined that the hotel's roof was in fact damaged by the hail.   Thus, Mr. Shopshear's finding of no damage, along with his willingness to accept any repair recommendation suggested by American States, effectively provided American States with the ability to unilaterally adjust the damage itself and set its settlement offer accordingly.

Mr. Shopshear's role as an independent insurance adjuster is to objectively document the extent of any damage and use that assessment to independently determine the amount necessary to repair or replace the covered property.   His role is not to provide the American States with a low-ball estimate to be used as an opening negotiation offer, which will only be increased if the insured independently retains a contractor of his or her own to calculate a rebuttal price estimate.   See Docket No. 56-10, at 89–90 (Mr. Shopshear defends his knowingly low Xactimate quote by stating that "there's room for adjustment" if the insured obtains his or her own contractor who performs their own independent estimate.).

It is evident that a genuine issue of material fact exists regarding the reasonableness of the process by which American States investigated the Lead GHR hail claim as concerns Mr. Shopshear.   A reasonable jury could find that American States acted without a reasonable basis in denying Lead GHR's claim on the basis of Mr. Shopshear's examination and price estimate.   In light of the questions concerning Mr. Shopshear's independence and American States' usage and re-characterization of the meaning of "damage" in its insurance

50

policy, a reasonable jury could find that American States' denial of coverage for Lead GHR's hail claim was not fairly debatable on the bases relied upon by American States.   Accordingly, the court recommends that American States' motion for summary judgment as to Lead GHR's bad faith claim be denied.

## D.   Punitive Damages

"Punitive damages are not an independent cause of action under South Dakota law, but can be awarded in addition to compensatory damages."   Berry v. Time Ins. Co., 798 F. Supp. 2d 1015, 1021 (D.S.D. 2011) (citing Schaffer v. Edward D. Jones & Co., 521 N.W.2d 921, 928 (S.D. 1994)).   Such exemplary relief is provided for by statute, "[i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, *actual or presumed*."   SDCL § 21-3-2 (2014) (emphasis added); see also SDCL § 21-1-4.1 (2014); Bertelsen v. Allstate Ins. Co., 2011 S.D. 13, ¶ 40, 796 N.W.2d 685, 699 (citing Biegler v. Am. Family Mut. Ins. Co., 2001 S.D. 13, ¶ 45, 624 N.W.2d 592, 605 (citing Kjerstad v. Ravellette Publ'n, Inc., 517 N.W.2d 419, 425 (S.D. 1994))) ("The required malice may be actual or presumed.").

"Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person."   Id., 796 N.W.2d at 699 (citing Biegler, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605 (quoting Case v. Murdock, 488 N.W.2d 885, 891 (S.D. 1992))).   "By contrast, presumed malice is 'malice which the law infers from or imputes to certain acts.'"   Id., 796 N.W.2d 685, 699 (quoting Harter v. Plains Ins. Co., 1998

51

S.D. 59, ¶ 36, 579 N.W.2d 625, 634 (quoting Holmes v. Wegman Oil Co., 492 N.W.2d 107, 112–13 (S.D. 1992))).   Similarly, "[p]resumed malice may not 'be motivated by hatred or ill-will but is [nonetheless] present when a person acts willfully or wantonly to the injury of others.' "   Biegler, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605 (quoting Case, 488 N.W.2d at 891).

In the first-party insurance bad faith context, "[a defendant] cannot be liable for punitive damages absent a finding of bad faith.   Roth v. Homestake Mining Co. of Cal., 74 F.3d 843, 845 (8th Cir. 1996) (affirming a decision from the District of South Dakota).   However, "[a]n insurer's clear breach of contract or denial of a claim that is not fairly debatable may indicate malice."   Bertelsen, 2011 S.D. 13, ¶ 41, 796 N.W.2d at 699.   Because American States denied coverage on the basis that hail damage must also impair the roof's functionality before it was required to pay a claim under the insurance policy, see, e.g., Docket Nos. 56-2, at 70 (stating that "[American States is] denying the hail damage because there's no functional damage"); 56-5 (the Haag Report referencing only functional damage), and because the accuracy and independence of Mr. Shopshear's estimates are questionable, the court has already concluded that Lead GHR's bad faith claim should be put to a jury.   See supra Part D.   For the same reasons, Lead GHR's request for punitive damages should also be placed before a jury.   Accordingly, the court recommends that American States' motion for summary judgment on Lead GHR's request for punitive damages, be denied.

## CONCLUSION

**Defendant's Motion for Summary Judgment**

Based on the foregoing law and analysis, this court respectfully recommends that the motion for summary judgment or partial summary judgment [Docket No. 44] by defendant American States Insurance Company be denied in its entirety.

**Plaintiff's Motion for Partial Summary Judgment**

The court further recommends that the partial motion for summary judgment [Docket No. 53] by plaintiff Lead GHR Enterprises, Inc., d/b/a Golden Hills Resort and formerly d/b/a Days Inn Lead, South Dakota be granted in part and denied in part as follows:

1. The court recommends granting plaintiff's partial summary judgment motion on the breach of contract claim by holding, as a matter of law, that American States breached the insurance contract.

2. The court recommends denying plaintiff's partial summary judgment motion on the breach of contract claim as to damages.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.   See FED. R. CIV. P. 72(b). A party may respond to another party's objections within fourteen (14) days of being served with a copy.   Id.   Failure to file timely objections will result in the

waiver of the right to appeal questions of fact.   Id.   Objections must be timely and specific.   Timely, specific objections to the findings and conclusions on the summary judgment motion will be reviewed *de novo* by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990) (per curiam); Nash v. Black, 781 F.2d 665 (8th Cir. 1986); see also 28 U.S.C. § 636(b)(1)(B) (2012).

Dated May 15, 2014.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE